# Eric G. Mart, Ph.D., ABPP

BOARD CERTIFIED FORENSIC PSYCHOLOGIST
LICENSED PSYCHOLOGIST (NH, MA, ME & VA)
LICENSED PSYCHOLOGIST-DOCTORATE (VT)

230 LAFAYETTE RD., BUILDING D, SUITE 7
PORTSMOUTH, NH 03801-5429
TEL. (603) 373-8801 | FAX (603) 373-0202
emart@comcast.net | www.psychology-law.com

July 25, 2016

Barry Kade, Esq.
604 N. Main St., PO Box 55
Montgomery, VT 05470

RE: Kirk Wool Assessment

Dear Attorney Kade:

I am writing at your request to provide you with report regarding my critique of the risk assessment of Kirk Wool (DOB ▮ 1959) performed by Claire Gilligan, Psy.D., on 3/17/2014. Additionally, the VRAG incorporates the score of the Psychopathy Checklist-Revised-Second Edition (PCL-R), so the scoring of this instrument affects the score of the VRAG. As we have discussed, I have a number of concerns about the manner in which Dr. Gilligan scored these three instruments with regard to Mr. Wool, and I will detail these below. In performing this assessment I have relied on Dr. Gilligan's report, the raw data from her assessment, and her answers to a number of sets of interrogatories propounded by Mr. Wool in Docket No. 634-6-14Cncv.

**Violence Risk Appraisal Guide (VRAG)**

The VRAG is an actuarial instrument designed to assess an offender's risk of violent recidivism based primarily on static factors. Static risk factors are generally those characteristics of an individual which are unlikely to change because of their historic nature. For example, an individual who is convicted of three counts of burglary will always have these offenses in his or her history no matter what he or she does subsequently. Items are scored based on the offender's history and points are added or subtracted based on the information used in scoring the test. Dr. Gilligan assigned Mr. Wool a score of 17, placing him in the seventh of nine risk categories based on scores. It appears that she miss-scored a number of the VRAG items, which had the effect of artificially inflating Mr. Wool's score. I will provide examples of her scoring and utilize the manual, which is contained in the book *Violent Offenders: Appraising and Managing Risk* (2003) by Quinsey et al.

1. Item 2

Item 2 (elementary school maladjustment) is scored as follows:

| No Problems | -1 |
|---|---|
| Slight (minor discipline or attendance) or moderate problems | +2 |
| Severe Problems (Frequent disruptive behavior and/or attendance or behavior resulting in expulsion or serious suspensions | +5 |

Dr. Gilligan gave Mr. Wool a score of +5 on this item. In a document entitled "Intervening Party's Responses to Plaintiff's Written Questions," dated 6/1/2016, Dr. Gilligan states that she "relied on the 1992 PSI (pages 4-5) which stated that Mr. Wool from age 9 engaged in illegal behavior with three convictions for breaking and entering. This resulted in his placement at Weeks School, a reform school for juvenile delinquents. He quit Weeks School in eighth grade, and was expelled from a prep school he was sent to next. Elementary school students who are well-adjusted do not engage in criminal behavior and are not placed in special schools for juvenile delinquents, do not quit school, and are not expelled."

It should be understood that relying on an offender's self-report is problematic, given the fact that many incarcerated individuals are motivated to misrepresent information about their life history, and that actual institutional records are the best source of information. If such information is unavailable, the evaluator has the option of skipping the item and prorating. My review of Dr. Gilligan's file in this matter indicates that she did not have direct information regarding Mr. Wool's school behavior up to and including eighth grade. Dr. Gilligan did inquire about Mr. Wool's educational history, and her notes state that he told her that he had never been expelled or suspended and did not have behavioral problems in school. Dr. Gilligan applies information about Mr. Wool's community adjustment to this item, but I think it is clear that this is inappropriate if one examines the scoring manual. In Appendix H of the VRAG manual (contained in the Quinsey et al. volume referenced above) entitled "Detailed Example of Scoring the Violence Risk Appraisal Guide," item #2, the hypothetical offender is given a score of +5, and the note containing the supporting information states "Frequently disciplined for disruptive behavior in classes and for fighting; assessed x2 age 11 for behavior problems; suspended at 11 for fire-setting; suspended age 13 for fighting." Additionally, in Appendix F, entitled "Manual For the Compilation of a Psychosocial History Suitable for Risk Assessment," the authors state under the heading "Education" (page 258) that "Questions in this section should be directed at behavior and adjustment in the educational system as well as discussing academic ability and achievement." The only information that Dr. Gilligan had was Mr. Wool's denial of such problems, and this item clearly is not designed to include maladjustment or delinquency in the community. Based on the information she had available, this item should have been scored -1 rather than +5.

2. Item 10

Item 10 of the VRAG is scored based on whether the offender meets the diagnostic criteria of the Diagnostic and Statistical Manual of the American Psychiatric Association-Third Edition (DSM-III) for any personality disorder. In her Responses to Plaintiff's Written Interrogatories, Dr. Gilligan is asked, "Please detail the specific mental health records that you claim to have reviewed to support your VRAG score saying I suffered from some form of "personality disorder." She responds, "I diagnosed Mr. Wool with other specified personality disorder with

RE: Kirk Wool                                                                                               Page 3
July 25, 2016

antisocial traits consistent with criteria as defined in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-V; American Psychiatric Association [APA], 2013). This was and continues to be my professional opinion as a doctoral level psychologist."

The DSM-5 states: "This category applies to presentations in which symptoms characteristic of a personality disorder that cause clinically significant distress or impairment in social, occupational or other important areas of functioning predominate but do not meet the full criteria for any of the disorders in the personality disorders diagnostic class. The other specified personality disorder category is used in situations in which the clinician chooses to communicate the specific reason that the presentation does not meet the criteria for any specific personality disorder. This is done by recording 'other specified personality disorder' followed by the specific reason (e.g., "mixed personality features")."

The DSM-5 is also very specific about what constitutes a personality disorder. A personality disorder is defined as follows:

A. An enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture. This pattern is manifested in two (or more) of the following areas:

   1. Cognition (i.e., ways of perceiving and interpreting self, other people, and events).
   2. Affectivity (i.e., the range, intensity, lability, and appropriateness of emotional response)
   3. Interpersonal functioning
   4. Impulse control

B. The enduring pattern is inflexible and pervasive across a broad range of personal and social situations.

C. The enduring pattern leads to clinically significant distress or impairment in social, occupational, or other important areas of functioning.

D. The pattern is stable and of long duration, and its onset can be traced back to at least adolescence or early adulthood.

E. The enduring pattern is not better explained as a manifestation or consequence of another mental disorder.

F. The enduring pattern is not attributable to the physiological effects of a substance (e.g., a drug of abuse, a medication) or another medical condition (e.g., head trauma).

Dr. Gilligan's diagnosis of Mr. Wool with Other Specified Personality Disorder with Antisocial Traits is problematic for a number of reasons. The first of these is that the diagnosis Other Specified Personality Disorder is designed to be used when someone does not meet the full criteria for a specific personality disorder (e.g., Antisocial, Borderline, Narcissistic) but is judged

Case 2:16-cv-00120-cr-jmc   Document 97-2   Filed 09/09/16   Page 4 of 12

RE: Kirk Wool
July 25, 2016

Page 4

to meet the general personality disorder criteria due to the presence of other personality disorder traits. Diagnosing Mr. Wool with Other Specified Personality Disorder with Antisocial Traits means that he does not meet the full criteria for Antisocial Personality Disorder, but the reader of Dr. Gilligan's report is given no information regarding what other aspects of his personality combined with Antisocial Traits meet the criteria for a personality disorder diagnosis. As matters stand in her report, the diagnosis makes little sense. If her diagnosis of Other Specified Personality Disorder consists solely of a single sub-threshold "Antisocial Traits" specifier, it cannot meet the definition of an actual personality disorder. On the other hand, if the antisocial traits that she references are sufficiently maladaptive to warrant a personality disorder diagnosis, then the proper diagnosis would be Antisocial Personality Disorder, but that is not the diagnosis she applied.

Another issue related to Dr. Gilligan's scoring of Mr. Wool as having a personality disorder for purposes of VRAG scoring is that the VRAG specifies that the individual must meet the DSM-III personality disorder criteria. This is problematic because the DSM-III does not include the diagnosis Other Specified Personality Disorder or its criteria, but instead includes the diagnosis Mixed Personality Disorder. This may seem like a minor point, but the VRAG was normed using the DSM-III and not the DSM-5.

This problem is made worse by Dr. Gilligan's explanation of her diagnosis with the statement, "This was and continues to be my professional opinion as a doctoral level psychologist." Given that Dr. Gilligan provides no other information regarding the data on which she makes this diagnosis, this would seem to be an example of the informal logical fallacy sometimes referred to as the argument from authority, which asserts that an argument is true or more likely to be true because an authority has stated it. This concept is related to the legal term "ipse dixit," in which a speaker makes a dogmatic statement and simply expects those listening to accept it. This flies in the face of the recommendations contained in the "Specialty Guidelines for Forensic Psychology," which was promulgated by the American Psychology-Law Society, the specialty division of the American Psychological Association for forensic psychologists. Section 10.06 of the Specialty Guidelines states: "Forensic practitioners are encouraged to recognize the importance of documenting all data they consider with enough detail and quality to allow for reasonable judicial scrutiny and adequate discovery by all parties. This documentation includes, but is not limited to, letters and consultations; notes, recordings, and transcriptions; assessment and test data, scoring reports and interpretations; and all other records in any form or medium that were created or exchanged in connection with a matter."

Other than Dr. Gilligan's assertion that her diagnosis of a personality disorder was based on her professional opinion as a doctoral level psychologist, there is no way of knowing how she arrived at this conclusion. The reader is left with no way of knowing in in what way Mr. Wool's cognition, affectivity, interpersonal functioning and impulse control at the present time deviate markedly from the expectations of his culture, are inflexible and pervasive across a broad range of personal social situations and lead to clinically significant distress or impairment in social, occupational other important areas of functioning.

RE: Kirk Wool                                                                                                      Page 5
July 25, 2016

It should also be pointed out that there are methods other than unguided clinical judgment, which is notoriously inaccurate, for diagnosing personality disorders. In the *Handbook of Diagnosis and Treatment of DSM-IV-TR Personality Disorders* by Len Sperry, M.D., Ph.D. (2003), the author notes that the Minnesota Multiphasic Personality Inventory-2, the Millon Clinical Multiaxial Inventory, the Rorschach Psychodiagnostic Test and the Thematic Apperception Test can be useful in diagnosing Antisocial Personality Disorder, and there are other tests, such as the Shedler-Weston Assessment Procedure, which are also useful. None of these appears to have been utilized by Dr. Gilligan.

3. Item 12

Item 12 of the VRAG is scored based on the examinee's total score on the Psychopathy Checklist – Revised - Second Edition (PCL-R). Mr. Wool's score of 24 on the PCL-R administered by Dr. Gilligan translated to a score of 0 on the VRAG. However, it should be pointed out that this item can be scored on the VRAG from -5 to 12 points. I am concerned that Dr. Gilligan appears to have misapplied the scoring criteria and inflated Mr. Wool's total score. Each of the 20 items on the PCL-R can be scored 2, 1, or 0. An item is scored 2 if it applies to the individual being rated and is a reasonably good match in most essential respects. A 1 is assigned if the item applies to a certain extent, if there are too many exceptions or doubts to warrant a score of 2, or there are conflicts between the interview and file information that could not be resolved. A score of 0 is assigned if the item does not apply or if the individual has characteristics that are the opposite of the intent of the item.

Scoring can become complicated in a case like Mr. Wool's because of his long period of incarceration and apparent change in behavior. The PCL-R manual states:

> PCL-R items are rated on the basis of the person's lifetime functioning as revealed by evaluations of the assessment data. Items should not be rated solely or primarily on the basis of present state or relatively recent behavioral history, each of which may be atypical of the individual's function because of extreme or unusual situational factors, an exacerbation of acute psychopathology (e.g., depression or psychosis) and so forth.

> Novice raters sometimes are unsure about what to do if the individual's behavior is erratic or inconsistent, or if there was a dramatic change in behavior at some point during the lifespan. For example, some forensic patients with bipolar disorders or psychoses may have dramatically different presentations at different times. In such cases, raters should score PCL-R items according to the person's typical functioning; that is, on an evaluation of how he or she functioned, on the average, throughout the lifespan.

In the previously mentioned Responses to Plaintiff's Written Interrogatories, Dr. Gilligan provides explanations for scoring of the PCL which appear to be at odds with both the general instructions of the manual and the item descriptions. Additionally, on page 4 of this document she notes that "Consistent with my training on this instrument, I gave more weight to traits/behaviors in the community because they tend to be constrained in highly structured settings." However, proceeding in this manner is not one of the instructions in the manual.

RE: Kirk Wool                                                                                                         Page 6
July 25, 2016

4. Item 4

In the manual, item 4, Pathological Lying, "describes an individual for whom lying and deceit are a characteristic part of his interactions with others. He is capable of fabricating elaborate accounts of his past even though he knows that his story can easily be checked. His readiness to lie, and the apparent ease with which he carries it off (even with people who know him well), can be quite remarkable. When caught in a lie or when challenged with the truth, he seldom appears perplexed or embarrassed. He simply changes his story or attempts to rework the facts so they appear to be consistent with what he said. He has an explanation or excuse for everything. Moreover, even after repeatedly breaking his promises and commitments to someone he still finds it easy to make new ones on "his word of honor." He often lies for obvious reasons, but deceiving others also appears to have some intrinsic value for him. He may freely discuss and take pride and pleasure in his ability to lie." The manual goes on to state that "in the interview, the individual may give conflicting accounts of his marital status, family background, previous occupations, education, crimes, and so forth; this is particularly apparent in long interviews. On occasion, it is useful to challenge him concerning these inconsistencies to see how he responds. Any challenges should be gentle at first; if the interviewer feel secure, he or she can become more pressing and persistent. Discrepancies between interview and file information, or within the files, are particularly telling; the individual may have a number of completely divergent and fictitious "life histories." People who score 2 on this item frequently use aliases and false identities. Files also contain comments made by institutional staff concerning the individual's reputation for insincerity."

Dr. Gilligan gave Mr. Wool a score of 1. She gave two examples of Mr. Wool's pathological lying; she stated that there were significant discrepancies between his self-report and records about the instant offense and his self-report to her during the interview, and she also noted that he stated that the offense summary he provided to an employee of the DOC had been found to be "acceptable and thorough," while the employee stated that she would not have used the term "thorough" but would have characterized it as "may be detailed." These two examples are hardly evidence of lying and deceit being a characteristic part of Mr. Wool's interactions with others across his life-span.

5. Item 7

In the manual, Item 7 (Shallow Affect) "describes an individual who appears unable to experience a normal range and depth of emotion. At times, he may impress as cold and unemotional. Displays of emotion generally are dramatic, shallow, short-lived; they leave careful observers with the impression that he is playacting and that little of real significance is going on below the surface. He is may admit that he is unemotional or that he shams emotions. Sometimes the individual claims to experience strong emotions, yet he seems unable to describe the subtleties of various affective states. He may equate love with sexual arousal, sadness with frustration, and anger with irritability. Also his emotions may not be consistent with his actions or with his situation."

The manual goes on to state, "In the interview, look for inconsistencies between verbal expressions of emotion and behavior. For example, if the individual expresses love for family or friends, can he provide details about their current whereabouts, health, financial condition, and general well-being? If a family member or friend has become seriously ill or has died, what effect did this have on him? Did he visit the hospital or attend the funeral? Are there strong verbal expressions of emotion accompanied by nonverbal behaviors consistent with that emotion? (Try to take into account the fact that incarceration may have an effect on the individual's general level of emotional expression and on his willingness to reveal feelings to those whom he thinks may be associated with the institution.) File information should be used to assess the validity of reports made during the interview. For example, the individual may state that he is close to his family, whereas his files indicate that he does not write or phone them and has had no visits from them. Also, files may contain interviews with friends and close relatives indicating that his behavior towards them has usually been incompatible with his verbal expressions of affection."

Apparently, Dr. Gilligan scored this item based on her subjective impression of Mr. Wool's emotional responsiveness during her interview and the fact that his discussion of his victim sounded rehearsed. No mention is made of the fact that Mr. Wool sought psychiatric treatment due to symptoms brought on by the death of his daughter, and there is no information from the file to indicate that those working with Mr. Wool find him incapable of experiencing a normal range and depth of emotion. Mr. Wool was seen for a number of psychiatric and mental health evaluations in the past. He was seen in April 2004 by Joe Link, Licensed Psychological Associate at the Marion Adjustment Center; there was no mention of flat or shallow affect. He was seen by Drs. Allen and Hansen in 2005 due to panic attacks and insomnia. Under the heading Mental Status Examination, he is described as follows; "Patient is a well-built, muscular gentleman with neatly combed gray hair and mustache. He is quite verbal and animated. He maintains good eye contact and is cooperative. Mood and affect are euthymic. He does not endorse suicidal or homicidal ideation. No auditory or visual hallucinations. Thought processes are linear, logical and goal-directed. Insight and judgment are good. Memory is intact and he is alert and oriented times three." Mr. Wool was also seen for psychiatric treatment starting in 2011. A psychiatric progress note dated 5/11/2011 states, "Inmate recently found out that his 27-year-old daughter was found dead in bed. Tearful but also appears to be looking for information related to 'her case' based on his questions. States 'I will be okay, I need to live for her' Distraught at times. Felt that he could 'not even think about meds right now.'" These observations are inconsistent with Dr. Gilligan's description of Mr. Wool as having shallow affect.

6. Item 9

According to the manual, Item 9 (Parasitic Lifestyle) "describes an individual for whom financial dependence on others is an intentional part of his lifestyle. Although able-bodied, he avoids steady, gainful employment; instead, he continually relies on family, relatives, friends, or social assistance. He obtains what he wants by presenting himself as helpless or as deserving of sympathy and support, by using threats or coercion, or by exploiting his victim's weaknesses. His use of others in this way is not simply the result of temporary circumstances that prevented

him from working or supporting himself. Rather, it reflects a persistent pattern of behavior in which others are called upon to support him and to cater to his needs no matter what the economic and emotional cost to them."

Dr. Gilligan gave Mr. Wool a score of 2 on this item. She explains her scoring of the item in part by stating that because of his criminal history, Mr. Wool has spent his adult life incarcerated at taxpayer expense. This of course is true of anyone who is incarcerated, and is clearly contrary to the intent of the item. She also notes that the manual states that "Merely supporting himself through crime… warrants a score of 1." Dr. Gilligan neglects to point out that although Mr. Wool certainly did engage in criminal behavior, he also had a substantial employment history, inconsistent with the scoring criteria for this item.

7.  Item 13

Item 13 (Lack of Realistic, Long-Term Goals) "describes an individual who demonstrates an inability or unwillingness to formulate and carry out realistic long-term plans and goals. He tends to live day to day and to change his plans frequently. He does not give serious thought to the future nor does he worry about it very much. He is seldom disturbed by the knowledge that he has done little with his life so far and that he is going nowhere. He may say that he is not interested in having a steady job or that he has not really thought about it much. He may lead a nomadic existence and describe himself as a drifter. Sometimes, the individual claims to have specific goals. For example, he may state that he is thinking of becoming a lawyer, writer, brain surgeon, social worker, psychologist, airline pilot, and so forth but he is unaware of the qualifications required for these professions. Also, he wants to make it to "easy Street," and is interested in "get-rich-quick" schemes. However, in such cases, questioning reveals that he has no idea how to achieve these goals, and the goals appear unrealistic given his education and employment record."

Dr. Gilligan gave Mr. Wool a score of 1 on this item. One example she used to rate the item was that Mr. Wool's idea of becoming a paralegal after his parole release was vague and lacked specificity. She also felt that his plan did not seem entirely realistic. Again, this seems contrary to the intent of the item description. Mr. Wool obtained a paralegal certificate through a correspondence program which he successfully completed. This is certainly more than the vast majority of long-term inmates have accomplished, and I do not see what is unrealistic about this plan. Additionally, given Mr. Wool's current situation, it would not be realistic for him to be job hunting at this time.

**Level of Service Inventory-Revised (LSI-R)**

Based on my review of the available documentation, there are problems with Dr. Gilligan's scoring of the Level of Service Inventory-Revised (LSI-R). However, it is important to point out that there are significant problems when using this instrument with individuals who have been incarcerated for long periods of time. The LSI-R was developed and normed with individuals who were on probation or parole or were serving relatively brief sentences. Consequently, it is difficult to apply the scoring criteria for many of the items in a logical fashion to long-term

inmates. For example, should an inmate who has been incarcerated for 20 years in a facility which does not have jobs for everyone who wants one be considered to be unemployed? These are the types of problems that come up when using the instrument with individuals who have been incarcerated for long periods of time. A number of individuals have experience with the LSI-R and are certified as trainers for the instrument; Thomas Powell, Ph.D., who is an associate of Dr. Gilligan's, is so certified. It is my understanding that these individuals suggest alternative scoring for individuals who have been incarcerated long-term. LSI-R items are rated Yes/No or on a 0-3 scale:

| A very unsatisfactory situation with a very clear and strong need for improvement | 0 |
| A relatively unsatisfactory situation with a need for improvement | 1 |
| A relatively satisfactory situation with some room for improvement evident | 2 |
| A satisfactory situation with no need for improvement | 3 |

There are number of specific scoring problems on Dr. Gilligan's LSI-R protocol and her explanations of her scoring.

1. Attitude Supportive of Crime - scored 0. Dr. Gilligan bases this on Mr. Wool's extensive criminal behavior across childhood, adolescence and adulthood. The item actually should be scored in terms of Mr. Wool's emphasis on the usefulness of criminal activity and endorsement that crime is justified; engaging in criminal behavior is addressed in the Criminal History section of the test.

2. Attitude Unfavorable Toward Convention - scored 0. Dr. Gilligan states that she gave the score because "Mr. Wool failed to adhere to conventional norms such as failure to commit to family obligations (page 5, PSI), poor school commitment (see pages 4-5, PSI) and poor work commitment both in the community and during his current incarceration (see page 5, PSI; see page 3, interview notes. The manual states that to receive a score of 0 "the client has a generalized disregard for conventional/noncriminal alternatives. He or she is nonsupportive, hostile and rejects the underlying values of society. The client has weak ties to conventional settings such as home and family and school and work and is negative, hostile and rejecting of non-criminal others ("I do not care what they think"). He or she invalidates or rejects noncriminal activities and their rewards and has a tolerance for deviance in general." While many of the items in the LSI-R require the evaluator to consider the year before the individual was incarcerated, the Attitude/Orientation items do not. There is nothing in the current records for the last decade or so that indicates that the above description fits Mr. Wool at the present time.

3. Psychological Assessment Indicated - scored "Yes." The only information available as to why this item was scored in this manner is the handwritten note "Current" on the LSI-R form filled out by Dr. Gilligan. The instructions scoring for this item state, "if the client has been assessed within the past year and the interviewer has knowledge of the problems that the assessment indicated were present, then answer 'Yes' for this item and note what the assessment indicated. If the client has never been assessed or it is unknown whether the client

has been assessed, but there are indicators of problems with the following, answer 'Yes' for this item. Note the problems that the client's behaviors indicate, for example:

- Intellectual functioning
- Academic/vocational potential
- Academic/vocational interests
- Excessive fears; negative attitudes toward self, depression, tension
- Hostility; anger; potential for assaultive behavior; over assertion/aggression
- Impulse control; self-management skills
- Interpersonal skills; under assertive
- Contact reality; severe withdrawal; overactivity; possibility of delusion/hallucination
- Disregard for the feelings of others; possibility of reduced ability or inability to feel guilt/shame; maybe superficially "charming" that seems to repeatedly disregard rules and feelings of others
- Criminal acts that do not make sense or appear rational
- Other (specify)

There is no indication that Mr. Wool has been psychologically assessed within the past year, and none of the problems from the manual listed above appear to be present. The intent of the item is clearly to determine whether the individual has had psychological problems within the last year which either caused him to have or indicated that he should have a psychological evaluation for diagnostic purposes. I believe it is inappropriate to score this item as a Yes when the evaluation is required by the DOC to determine classification; that this was the case is suggested by Dr. Gilligan's notation "current."

4. Under the heading "Accommodation," there are three items, Unsatisfactory, Three or More Changes in the Last Year and High Crime Neighborhood. Dr. Gilligan scored Accommodation - Unsatisfactory - 0. The LSI-R manual states that to receive a 0, "the client is unhappy or dissatisfied with his or her accommodation situation. He or she takes no pride and makes no attempt to improve the residence. The client expresses a desire to move, and others that live there would like for him or her to move." Dr. Gilligan states "I relied on Mr. Wool's status as an inmate to rate a score of zero (0) per the LSI-R User's Manual (Page 8)." There is no mention of an automatic rating of 0 on page 8 of the manual. Dr. Gilligan also gives Mr. Wool a 0 for "High Crime Neighborhood" based on the same rationale. In addition to there being no reference to being incarcerated as an automatic 0 on these items, the manual states under Three or More Address Changes Last Year "Record number of address changes within the last 12 months or in the year prior to incarceration. Do not include a period of incarceration as an address change." Admittedly, this is a problematic item when applied to individuals who have been incarcerated for long periods of time, but the fact that the address change item is linked to the inmate's living situation 12 months prior to incarceration supports the idea that incarceration in and of itself does not justify this score.

5. As I mentioned at the outset of this report, the LSI-R was not originally designed for individuals who have been incarcerated for long periods of time, and this is made clear by the wording of many of the questions. In my conversations with other psychologists who have

used this instrument or train others to do so, it is my understanding that the modification of the scoring of some of the statements is recommended at the present time. For example, it is my understanding that if an individual left school early but received a GED and had other educational upgrades, he is not penalized for dropping out in the scoring. I noticed that on Dr. Gilligan's protocol in the Education/Employment section, she actually wrote in GED. In the same way, it is my understanding that the Accommodation section should be omitted for inmates with lengthy periods of incarceration who are currently in prison. On Dr. Gilligan's LSI-R protocol on the Accommodation section, she wrote in "omit," which appears to indicate that she was aware of this scoring modification. However, a careful review of her scoring indicates that she did not omit the accommodations questions, nor did she modify the scores on the education questions.

6. It is important to point out that the LSI-R was never intended to be administered and scored in an inflexible manner. Under the heading Principles of Use, the manual states the following: "It is important that the test user realizes that the LSI-R is not intended to be the only instrument for assessing the level of service required for an individual, nor is the LSI-R to be used as a substitute for sound judgment that utilizes various sources of information." Additionally, the authors include a section at the end of the LSI-R designed to allow the clinician to utilize professional judgment and raise or lower an individual score on that basis. On page 12, under the heading Circumstances Requiring Special Attention, the authors note that "The LSI-R tries to provide a comprehensive assessment of offenders. However, it is impossible for see all possibilities and to assess all factors that may influence the likelihood of criminal behavior. The trained professional is encouraged to document features of an offender's situation that may require special consideration and that may even override the quantitative risk/needs assessment of the LSI-R. However, Dr. Gilligan left this section of the test blank. While she notes a number of positive aspects of Mr. Wool's behavior while incarcerated, she did not apply any of the circumstances to the score of the LSI-R. Some of these factors include the following:

- Mr. Wool has held several jobs while incarcerated, including as a grievance aid, librarian support, and running a printing press.

- He reports being sober for 22 years and there were no indications of any positive drug tests or substance abuse violations while he was incarcerated

- He received a letter of gratitude and a reward of $250 from the DOC in 2004 for his "willingness to protect [staff] members by putting himself in harm's way" during a disturbance at the Lee Adjustment Center in September 2004.

- Mr. Wool had one disciplinary action in 1992 and another in January 2014 which was repealed. His case manager reported that there had been no behavioral problems with Mr. Wool during his incarceration in Vermont.

- Mr. Wool is in the process of applying to the sexual offender program at the facility where he is incarcerated and was doing so at the time of Dr. Gilligan's evaluation.

- Mr. Wool apparently completed a paralegal certificate course while incarcerated.

- While Mr. Wool does not currently have a job at the prison, he volunteers his time using his paralegal skills to assist other inmates in filing motions.

These issues and other protective factors, such as Mr. Wool's age, could have been used to modify his scores on the LSI-R but were not. Dr. Gilligan is certainly entitled to apply her clinical judgment in making modifications to the scoring of the LSI-R, but there is no indication on the protocol that she did so.

These are my observations and opinions regarding Dr. Gilligan's scoring of Mr. Wool's LSI-R, PCL-R-2 and VRAG. Please feel free to contact me if you have questions or require further information.

Sincerely,

*Eric Mart, Ph.D.*

Eric G. Mart, Ph.D., ABPP (Forensic)
Licensed Psychologist

EGM / km